**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MONTANA**

In re

**RICHARD M. BLOSSER,**

Debtor.

Case No. **2:26-bk-20082-BPH**

**ORDER**

In this Chapter 7 bankruptcy, a hearing was held on August 14, 2026, on Trustee's Motion to Substantively Consolidate Pathfinder Wealth Advisors, LLC ("Pathfinder") and Sanctuary Partners LLC ("Sanctuary") into the Debtor's bankruptcy estate, nunc pro tunc.[1] Trustee's Exhibits 1–53 were admitted.[2] The Substantive Consolidation Motion was served by the Trustee with a Notice and Opportunity to Respond. Debtor, Richard Blosser ("Blosser"), was the only party who objected.[3] A hearing was set by Order of the Court for August 14, 2026.[4] The following witnesses testified: Blosser; Sabine Weiland; James Freeman; and John Baniewicz.

At the conclusion of the hearing, the Court granted the relief requested and explained its rationale based on its findings and conclusions from the evidence presented. It further indicated that a written order would follow the oral ruling.

## I. Findings of Fact based on evidence introduced at the hearing

Blosser is the sole member of Pathfinder. Sanctuary has two members. Sanctuary's members are Blosser and his wife Pamela Blosser ("Pamela"). Blosser individually provides all funding to pay liabilities of Sanctuary and Pathfinder.

Blosser's representations to lenders are inconsistent and inaccurate. For example, when opening an account at Bank of America, Blosser indicated he was the sole member of

---

[1] *See* ECF Nos. 96 ("Substantive Consolidation Motion"), 136, 145.

[2] Exhibits 1-50 were prefiled at ECF Nos. 132, 133 and 173. Exhibits 51-53 were admitted at hearing for rebuttal purposes and will be made part of the record by the clerk.

[3] ECF No. 136.

[4] Debtor filed an "Emergency Motion to Continue" on the date of the August 14, 2026, hearing at ECF No. 185 ("Emergency Motion"), seeking to continue the hearing. For the reasons stated on the record, Debtor's Emergency Motion was denied.

Sanctuary.[5] When seeking a loan from Big Sky Strategic Holdings LLC,[6] Blosser represented that he had retirement accounts worth $880,000.[7] Blosser subsequently testified that he does not have retirement accounts worth $880,000. When seeking a loan from Arixa, Blosser represented that he had approximately $5,000,000 in stocks and bonds.[8] At the hearing, he testified he did not own stocks and bonds worth $5,000,000.

Sanctuary, acting as "Borrower," and Blosser and Pamela as "Guarantors," entered a Loan Modification Agreement ("Modification Agreement") with Big Sky Strategic Holdings, LLC, as "Lender" following the filing of this case.[9] Under the Modification Agreement, the parties agreed that repayment of the loan would be secured by:

1. An additional lien on real property in the Yellowstone Mountain Club ("Fossil Road" or "Big Sky" Property);
2. An additional lien on real property in Bozeman, MT ("Westlake Property");
3. Unconditional personal guarantees of Blosser and Pamela; and,
4. A lien on "all collateral," of Pathfinder.[10]

The Modification Agreement evidences an agreement under which Sanctuary and Pathfinder are obliged to encumber assets, and Blosser and Pamela unconditionally guaranty repayment of the indebtedness.[11] Similarly, Blosser, Pathfinder and Sanctuary entered an agreement with LD3 Management LLC, in September 2025, in which Blosser, Pathfinder, and Sanctuary promised to repay a loan for $350,000, and each agreed to encumber their assets to secure the loan.[12]

Through a combination of exhibits and Blosser's testimony, the Trustee established that, despite a June 2025 account statement for Sanctuary with a Pathfinder logo showing $5 million in assets, Sanctuary did not own stocks with a value of $5 million in June 2025. Blosser's testimony and exhibits presented by the Trustee establish that Sanctuary misrepresented its June 2025 account statements, showing that it possessed $5 million in assets it never held. Similarly, in May 2026, Blosser generated an account statement with a Pathfinder logo for the John H. Weiland 2025 Irrevocable Family Trust ("Weiland Trust"). According to that statement, the

---

[5] Ex. 33.

[6] Blosser may alternatively have been seeking a loan from John Kiernan or both, the testimony was unclear on this point.

[7] Ex. 8.

[8] Ex. 16.

[9] Ex. 48.

[10] *Id.*

[11] *Id.*

[12] Ex. 45

Weiland Trust had total assets under management in excess of $12 million. The account statement was not true. There were no funds in a custodial account for the Weiland Trust in May 2026.

Rather than invest and manage funds received from the Weiland Trust, Blosser used the funds for other, unauthorized purposes. On one occasion in 2025, after directing one of the Weiland Trust trustees to wire $550,000 to the Pathfinder account, Blosser moved those funds to a combination of Sanctuary and personal bank accounts. The funds were not placed in a custodial account, invested or otherwise managed. Instead, between April 4th and 11th, Blosser made a series of transfers from the Pathfinder account to his personal and Sanctuary accounts.[13] Blosser "could not recall," how he used the Weiland funds. However, a portion of the funds were used to pay Sanctuary's mortgage payment on the Big Sky Property.

On March 27, 2026, the Weiland Trust wired another $1.25 million to a non-custodial Pathfinder account at Bank of America, consistent with Blosser's instructions. On the same day it was received, Blosser immediately began moving the money to other accounts and using the funds for unauthorized purposes. For example:

- $5,000 to Pamela;
- $18,771.66 to IPFS Corporation;
- $13,000 to Louis Gresham, (Blosser's son in law);
- $20,331.94 to Arixa for mortgage payment on Westlake Property;
- $5,000 to Monday Funding;
- $4,950 to Baxter Credit Union;
- $30,000 to Florence G. Collins Trust (Pamela is trustee of this trust);
- $20,000 to Florence G. Collins Trust; and,
- $700,000 to Derek Tisdel ("Tisdel").

Blosser received the Weiland funds on the same day he filed his petition commencing this Chapter 11 case. It was converted to Chapter 7 approximately 45 days later.[14]

The Tisdel payment is important because it suggests a pattern of soliciting investors and, upon receipt of one investor's funds, using the funds to pay a "return" to another investor. By letter dated March 23, 2026, Tisdel's attorney demanded return of Tisdel's $700,000 investment. His letter highlighted that Blosser was barred by the Financial Industry Regulatory Authority from acting as a broker or associating with a broker dealer firm. He also noted Tisdel had demanded return of his investment during the preceding 60 days, but the funds had not been returned. The letter threatened legal action if Tisdel's investment was not returned by March 20, 2026. Blosser wired $700,000 to Tisdel from the Pathfinder account on March 31, 2026, just four days after receiving the funds from the Weiland Trust.

---

[13] Ex. 31.

[14] As the record before the Court develops, it increasingly appears Blosser expected to file a Chapter 11 petition, enjoy the benefit of the stay, stop a foreclosure, obtain funding without disclosure to the Court, resolve the foreclosure and dismiss his case. Instead, the case was converted to Chapter 7 following a hearing and notice.

Like Tisdel, James Freeman ("Freeman") and John Baniewicz ("Baniewicz") were promised quick returns as part of a special investment opportunity Blosser was making available to "friends and family." Freeman was acquainted with Blosser through Princeton alumni activities. Baniewicz was the best man at Blosser's wedding, his roommate at Princeton, and played football with him. Both were promised 25% profit in a derisked trade involving "Ambac" debt, with a short turn around. Freeman believed he was investing $150,000, while similarly Baniewicz thought he was making a $10,000 "derisked" investment. There was no investment. Blosser did not invest the Freeman or Baniewicz funds. He used the funds for unauthorized purposes.

The testimony of Sabine, Freeman, and Baniewicz was not only credible, it was compelling. Sabine relied on a professional referral and vetted Blosser before making investments with him. She testified that her agreement with Blosser explicitly provided the funds would be held in custodial accounts. Blosser seemingly had no reservations when he solicited investments from his "friends," and almost immediately used their funds for Sanctuary, personal expenses, and other uses that remain to be determined.

Conversely, Blosser's testimony was incredible at times, often indicating he did not recall when responding to a question. With regards to the financial transactions, the Trustee painstakingly directed Blosser from one exhibit to the next, identifying deposits into Sanctuary and Pathfinders accounts that originated with investors and transfer of those funds to unidentified third parties or to pay Sanctuary's and the Blossers' liabilities.

There remain significant gaps in Blosser's testimony, causing the Court to question his credibility. For example, although he professes to be doing his best to help the Trustee, he has failed to provide the information she has requested and that she is entitled to receive, resulting in an Order to Show Cause and contempt that is the subject of a separate order. For example, he testified he was not familiar with jewelry described in detail on an insurance policy in 2018.[15] The policy has coverage for $1,232,000.[16] The policy named him as an insured.[17] The only inference to draw from this evidence is that, at one time he was very familiar with the jewelry and wanted to insure it. His lack of familiarity with the items today is inexplicable.

Blosser suggested Pamela was better acquainted with the jewelry. However, when questioned about the jewelry, Pamela could only confirm she was familiar with five of the 19 described items. She credibly acknowledged that the following items were in their possession:

- LADIES CUSTOM MADE PLATINUM WEDDING BAND CONTAINING 18 ROUND BRILLIANT CUT DIAMONDS WEIGHING A TOTAL OF 3.50CT., THE DIAMONDS ARE "E-F" IN COLOR AND "VS2" IN QUALITY

---

[15] Ex. 37.

[16] *Id.*

[17] *Id.*

**$9,723**

- ONE CUT-CORNERED RECTANGULAR MODIFIED BRILLIANT DIAMOND, DIAMOND IS NATURAL FANCY LIGHT OF 10.02 CTS., G.I.A. CERTIFICATE #136/9093 ($154,000.00); SETTING: PLATINUM AND 18K YELLOW GOLD WITH MATCHING TRAPEZOID WHITE DIAMONDS OF G/H COLOR, VS1 2 CLARITY, TOTAL WEIGHT 1.SCTS
  **$260,409**
- ETERNITY BAND PLATINUM WITH 16 EMERALD CUT DIAMONDS SET IN U SHAPPED PRONGS AROUND ENTIRE BAND. DIAMONDS ARE D-G IN COLOR WITH CLARITY OF VVS1-VS2 AND A TOTAL WEIGHT OF 8.92 CTS.
  **$68,482**
- CARTIER LOVE YELLOW GOLD 1MCM BRACELET
  **$6,850**
- LADY'S DIAMOND ENGAGEMENT RING-CENTER STONE IS CUSHION MODIFIED BRILLIANT CUT DIAMOND, WITH AN EXACT WEIGHT OF 10.09CTS F COLOR, WITH CLARITY GRADE OF S.I.2. THE DIAMOND IS SET IN A FOUR PRONG PLATINUM SETTING, WITHIN A DIAMOND FRAME, ON A CUSTOM PLATINUM RING, WITH A CATHEDRAL. THE ARE 118 FULL CUT ROUND DIAMONS, PRONG SET ON THE FRAME. DIAMONDS ARE F-G COLOR, WITH A CLARITY GRADE OF V.S.1-V.S.2 AND TOTAL WEIGHT OF 1.81CTS
  **$407,084**[18]

As a result, there are at least 14 pieces of jewelry that were previously Blosser's property that he can no longer identify or remember. At one point, Pamela suggested Blosser may have had a girlfriend. While the record does not establish Blosser had a girlfriend, the Court is convinced a more fulsome explanation exists and Blosser has elected not to provide it.

Finally, the Court's recitation of its factual findings here emphasizes the salient points, but it is important to note that, with the exception of Blosser, no other party objected to the relief requested. When questioned if there were any creditors of Pathfinder or Sanctuary that were not creditors of Blosser or lacked notice of this bankruptcy, Blosser answered "no." While Big Sky Strategic Holdings argued at the hearing that it did consider Sanctuary, Blosser, Pamela, and Pathfinder in their separate capacities, there is no evidence in this record to support that contention. For purposes of the Substantive Consolidation Motion, the evidence introduced by the Trustee was uncontroverted.

## II. Conclusions of Law

The controlling authority governing requests for substantive consolidation in the Ninth Circuit is *Alexander v. Compton (In re Bonham)*, 229 F.3d 750 (9th Cir. 2000), which explicitly adopted the standards and analysis articulated by the Second Circuit in *Union Savings Bank v. Augie/Restivo Baking Co., Ltd. (In re Augie/Restivo Baking Co., Ltd.)*, 860 F.2d 515 (2d Cir. 1988). *Bonham*, 229 F.3d at 766. Substantive consolidation allows the bankruptcy court to "combine the assets and liabilities of separate and distinct—but related—legal entities into a

[18] *Id.*

single pool and treat them as though they belong to a single entity." *Id.* at 764. The consolidation creates a single fund from which "all claims against the consolidated debtors are satisfied; duplicate and inter-company claims are extinguished." *Id.* (citing *Augie*, 860 F.2d at 518). "The sole purpose of substantive consolidation is to ensure the equitable treatment of all creditors." *Augie*, 860 F.2d at 518.

This Court acknowledges that substantive consolidation is an extraordinary remedy that must be used sparingly and only in unusual circumstances. The record in this case, as shown through the testimony and exhibits, weighs in favor of finding application of this remedy is necessary in this case because the circumstances are unusual. Absent application of this remedy here, this Court will enable Blosser's practice of soliciting investment funds from his friends and family that are quickly diverted to unauthorized purposes such as mortgage payments on Sanctuary's Big Sky Property, Blosser's personal liabilities, and fund transfers to Pamela and the Florence G. Collins Trust.[19]

The *Augie* test, as adopted by the Ninth Circuit, outlines a two-part disjunctive standard to determine whether substantive consolidation is warranted. The presence of either factor is a sufficient basis to grant a request for substantive consolidation. *Bonham*, 229 F.3d at 766. Under one standard, the court considers whether the creditors dealt with the entities as a single economic unit and did not rely on their separate identity when extending credit, i.e., the creditor expectation rationale. *Id.* Alternatively, the second standard directs the court to evaluate whether the affairs of the debtor are so entangled that consolidation will benefit all creditors, i.e., the entanglement rationale. *Id.*

When considering the evidence presented, this Court is cognizant of the burden of proof. Once the trustee establishes a close interrelationship between the debtor and the non-debtor entities (such as through the commingling of assets and the operation of the entities without corporate formalities), a presumption arises that the creditors did not rely on the entities' separate credit. *Clark's Crystal Springs Ranch, LLC v. Gugino (In re Clark)*, 548 B.R. 246, 254 (BAP 9th Cir. 2016); *Bonham*, 229 F3d at 766. The Trustee has effectively established "a close interrelationship between the debtor and the non-debtor entities." Nothing in the evidentiary record rebuts the presumption or even hints at any reliance on the entities' separate credit.

This Court's analysis here closely mirrors the *Bonham* Court's analysis. The four factors considered by the Bonham Court provide this Court with an analytical framework. First, this Court has concluded Pathfinder and Sanctuary were "but instrumentalities of the bankrupt with no separate existence of their own." *Bonham*, 229 F.3d at 766 (quoting *Soviero v. Franklin Nat. Bank of Long Island*, 328 F.2d 446, 448 (2d. Cir. 1964)). Blosser moved money between Pathfinder, Sanctuary, and his personal accounts as needed to satisfy any immediate demand, or threat that risked exposing his machinations. Blosser used Pathfinder to lend a veneer of legitimacy to his investment solicitations, but beyond the ministerial act of filing papers with a secretary of state, nothing separates Blosser, Pathfinder, and Sanctuary.

---

[19] These are just examples and not intended to capture the university of unauthorized uses, the Trustee may ultimately discover when no stone is left unturned.

Pathfinder was used to solicit funds and leave investors with a sense of confidence that their funds would be invested and managed. Sanctuary was utilized to either receive investor funds in the first instance, or as a transferee when investors initially sent their funds to Pathfinder. Both entities have been utilized by Blosser to use funds intended for investment purposes for his personal purposes and benefit.

Second, Blosser, Pathfinder, and Sanctuary enjoy a unity of interests that has resulted in commingling. *Id.* at 767 (quoting *Soviero*, 328 F.2d at 448). Blosser exercises exclusive control over Pathfinder and Sanctuary. At no point in his testimony did he indicate Pamela, as the second member of Sanctuary, directed a transfer from Pathfinder to Sanctuary or from Sanctuary to any third-party. According to the record presented at the hearing, Blosser has singularly caused funds entrusted to Pathfinder for investment purposes to be diverted for non-Pathfinder purposes. Additionally, there is no indicia the entities have maintained any records or even filed taxes.

Third, there is "no clear demarcation" between the affairs of Blosser, Sanctuary, and Pathfinder. *Id*. The affairs of Pathfinder and Sanctuary are closely tied to the affairs of Blosser. The evidence presented repeatedly shows funds received by Sanctuary and Pathfinder are used for non-investment purposes that benefit Blosser and other transferees, including family members. Without Blosser, neither Pathfinder nor Sanctuary could exist. Sanctuary holds assets for the benefit of Blosser and Pamela, but Sanctuary has no independent ability to service its debts or prevent foreclosure. It does not generate any income. Similarly, no one would retain Pathfinder to invest funds in custodial accounts without Blosser or some other broker advisor. Blosser is Pathfinder's only employee, underscoring each entity's complete dependence on Blosser. The affairs of Blosser, Pathfinder, and Sanctuary are indistinguishable.

Finally, adhering to the separate corporate entities theory would result in an injustice to the bankrupt's creditors. *Id.* at 768. Having failed to respect the distinctions between Pathfinder and Sanctuary prepetition resulting in a loss of $5 million to the Weiland Trust, loss of $120,000 to Freeman,[20] $10,000 to Baniewicz, and potentially others could only be described as an injustice. Although Baniewicz's loss was the smallest when measured solely by the investment, as a proportion of his savings and annual income, his loss might be the greatest.

This observation is neither intended to minimize or marginalize the financial injuries suffered by Freeman or the Weiland Trust after placing their trust in Blosser. Instead, the observation is intended to highlight the inequities of denying relief. Baniewicz and others whose loss may be comparatively small to other creditors likely would have no way to recover against Pathfinder or Sanctuary, absent substantive consolidation.

This Order supplements the Court's oral ruling at the hearing, and if there are inconsistencies, this Order is controlling. Accordingly, IT IS ORDERED:

1. The Substantive Consolidation Motion at ECF No. 96 is GRANTED and Blosser's Emergency Motion at ECF No. 185 is DENIED.

---

[20] Although Freeman's investment was $150,000, it appears Blosser remitted $30,000 to Freeman at some point. Ex. 41.

2. Pathfinder Wealth Advisors, a California limited liability company ("Pathfinder"), and Sanctuary Partners, LLC, a Wyoming limited liability company ("Sanctuary") are substantively consolidated with the Debtor, Richard M. Blosser, effective nunc pro tunc to March 27, 2026.

3. Any assets of Pathfinder or Sanctuary, including any and all bank or financial accounts and information, shall be considered assets of the bankruptcy estate of the Debtor, Richard M. Blosser, and shall be administered by Chapter 7 Trustee, Darcy Crum, or any successor trustee, along with Blosser's other non-exempt assets.

4. Any creditors of Pathfinder or Sanctuary shall be treated as if they are creditors of the bankruptcy estate.

5. The Trustee shall retain and preserve any avoidance powers he may have under the Bankruptcy Code (including but not limited to 11 U.S.C. §§ 542, 547, 548 and 549) as they apply to any pre- or post-petition actions by Pathfinder or Sanctuary.

6. The Clerk of Court shall serve a copy of this Order on all parties identified in the Mailing Matrix through the Bankruptcy Noticing Center.

7. The Trustee shall email a copy of this Order to Debtor on or before **August 18, 2026**.

Dated August 17, 2026.

BY THE COURT:

Hon. Benjamin P. Hursh
United States Bankruptcy Court
District of Montana